# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| *In Re: Lahaina Wildfire Litigation* | 1:23-cv-00435-JAO-BMK<br><br>(Class Action)<br><br>**CONSOLIDATED COMPLAINT** |

## CLASS ACTION COMPLAINT

Plaintiffs Nova Burnes; Maui Concierge Aesthetics, LLC; Lani Chadli, individually and as Trustee of the Aotaki Family Irrevocable Trust; Monica I. Eder; Rede S. Eder; Candace Faust; Peter Faust; David Heymes; Kathryn Llamas; Jennifer Lynn McNamee; Chardell Naki; Barret Procell; and Rolland Williams Jr., individually and on behalf of others similar situated, bring this action against Defendants Hawaiian Electric Company, Inc. dba Hawaiian Electric; Maui Electric Company, Limited dba MECO; Hawai'i Electric Light Company, Inc.; Hawaiian Electric Industries, Inc. (collectively, the "HECO Defendants"); Trustees of the Estate of Bernice Pauahi Bishop ("Bishop Estate"); Hawaiian Telcom; Hawaiian Telecommunications, Inc.; Hawaiian Telcom, Inc.; Spectrum Oceanic, LLC (collectively, "Telecommunications Defendants"); Peter Klint Martin; Peter Klint Martin Revocable Trust; Hope Builders Holding LLC; Hope Builders Inc.; Hope Builders LLC; Kauaula Land Company LLC; Kipa Centennial, LLC; James C. Riley Trust; Jeanne A. Riley Trust; Wainee Land & Homes, LLC; West Maui Land Company, Inc.; Makila Ranches Inc.; Makila Land Co., LLC; Makila Ranches Homeowners Association, Inc.; JV Enterprises, LLC ("West Maui Landowner Defendants"); County of Maui; and Doe Defendants 1–10, and allege the following:

## NATURE OF THE ACTION

1.      Early on the morning of August 8, 2023, downed power lines that HECO Defendants owned and operated sparked the deadliest wildfire in more than a century of U.S. history ("Fire" or "Lāhainā Fire"). The Fire burned more than 2,000 acres across Lāhainā, tragically taking 101 lives and causing thousands of people to lose their homes, businesses, and livelihoods. Lāhainā is also the site of the first capital of the Hawaiian Kingdom. It contains some of the most historically significant cultural properties and sacred remains of Native Hawaiians.

2.      Firefighters reported that they contained the Lāhainā Fire that morning. They did not extinguish the Fire, which continued to smolder. In the afternoon, winds grew stronger and picked up embers from the Fire, causing it to flare at its area of origin on Bishop Estate land. The Fire moved quickly through the Estate's unmaintained land, which was overgrown with highly flammable nonnative vegetation. Wind gusts pushed flames through dense neighborhoods into Lāhainā, as the Fire grew rapidly in size and intensity. Hundreds of homes burned in a matter of hours, forcing residents to evacuate with minimal or no notice.



*Infrared Images from NASA's Earth Observatory*
*(Aug. 8, 2023, 10:25 p.m. HST)*

3.      Cellphone towers burned or lost power, leaving people unable to communicate, receive emergency alerts, or both. Flames and downed power lines blocked  or forced the closure of the two main roads that served as escape routes out of Lāhainā, funneling evacuees into an inferno of gridlock. Former agricultural lands, fallow and overgrown with non-native grasses, abutted these roads, fueling the Fire's rapid spread. The County's powerful emergency warning sirens never made a sound. Fire hydrants ran dry.



*Waiola Church and Lāhainā Hongwanji Mission engulfed in flames on August 8.*[1]

4.      Had the HECO Defendants acted responsibly, the Lāhainā Fire could have been prevented. Despite High Wind and Red Flag weather warnings from the National Weather Service ("NWS") cautioning that winds could topple power lines and cause fires to spread rapidly, the HECO Defendants failed to implement necessary fire prevention and mitigation measures. The utility company's aging infrastructure failed, igniting the deadly inferno.

---

[1] *Scenes From the Hawaii Fires and the Aftermath*, N.Y. TIMES (Aug. 11, 2023), https://www.nytimes.com/2023/08/11/us/hawaii-fires-photos.html.



*Photographs taken after the devastating fire.*[2]

 5. Plaintiffs bring claims on behalf of themselves and all others similarly situated, to hold Defendants liable for this avoidable tragedy and enable the community to rebuild.

**PARTIES**

**A. Plaintiffs.**

 6. Plaintiff Nova Burnes was at all times relevant a resident of Maui County, State of Hawai'i. Ms. Burnes is an owner, member, and operator of Plaintiff Maui Concierge Aesthetics, LLC.

 7. Plaintiff Maui Concierge Aesthetics, LLC ("Maui Concierge") is a Hawai'i domestic limited liability company, with its principal place of business in Maui County, State of Hawai'i. At all relevant times, Maui Concierge operated a salon at 180 Dickenson St., Lāhainā, Hawai'i, 96761. All members of Maui Concierge are residents of Hawai'i.

 8. The Lāhainā Fire leveled Maui Concierge's salon at 180 Dickenson, destroying business equipment and property, as well as personal property belonging to Nova Burnes.

 9. As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiff Nova Burnes has suffered injuries and damages, including

---

[2] *Id.*

destruction of personal property, out of pocket expense, loss of income, annoyance, aggravation, and inconvenience.

10.     As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiff Maui Concierge has suffered injuries and damages, including loss of personal property and loss of business income.

11.     Plaintiff Lani Chadli, was at all times relevant a resident of Maui County, State of Hawai'i.  Plaintiff Chadli is a Trustee of the Aotaki Family Irrevocable Trust, which owns her residence at 1634 Ainakea Rd., Lāhainā, Hawai'i, 96761. Plaintiff Chadli is an educational assistant for children with special needs and a caretaker for her 90-year-old mother.

12.     On the morning of the Fire, Plaintiff Chadli heard from friends about a brushfire near the Lāhainā Intermediate School but had no reason to believe the Fire would reach her home at the northern end of Lāhainā. By the time Plaintiff Chadli learned that the Fire was heading towards her home, she had no time to gather her belongings before evacuating. She swiftly loaded her 90-year-old mother into her car and left for the evacuation zone. The Lāhainā Fire consumed her entire home and all of her belongings, including family heirlooms. She, her mother, and her son have been displaced since the Fire and have had to rely on temporary housing in hotels that can accommodate her mother's wheelchair.

13.     As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiff Chadli has suffered injuries and damages, including a complete loss of the property at 1634 Ainakea Road, loss of personal property, and emotional distress.

14.     Plaintiffs Monica I. Eder and Rede S. Eder own a townhome located at 1400 Limahana Circle, Lāhainā, Hawai'i, 96761.

15.     As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiffs M. Eder and R. Eder suffered real and personal property damages.

16.     Plaintiff Candace Faust owns a townhome located at 41 Puapake Place, Lāhainā, Hawai'i, 96761, which the Lāhainā Fire destroyed. As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiff Faust suffered real and personal property damages and personal injuries, including emotional distress.

17.     As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiff C. Faust's husband, Plaintiff Peter Faust suffered both personal property damages and personal injuries, including emotional distress.

18.     Plaintiffs Kathryn Llamas and Barrett Procell were at all times relevant residents of Maui County, State of Hawai'i. Mr. Procell and Ms. Llamas rented a residence located at 1406 Front Street, Suite A, Lāhainā, Hawai'i, 96761. Plaintiff Procell is a spearfishing guide and a realtor. Plaintiff Llamas is a personal trainer.

19.     Plaintiffs Llamas and Procell fled their home as the Fire closed in. As they fled, they felt the heat of the oncoming fire and could see it advancing rapidly. The Lāhainā Fire soon razed their home and destroyed almost all of their personal possessions and work equipment. Plaintiffs Llamas and Procell have been displaced since the Fire, unable to find steady housing and unable to work.

20.     As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiffs Llamas and Procell have suffered injuries and damages, including loss of personal property, loss of income, and emotional distress.



*View of the Lāhainā Fire taken from near Plaintiffs Llamas and Procell's home as the Fire approached.*



*Plaintiffs Llamas and Procell's home before and after the Lāhainā fire.*

21.    Plaintiff David Heymes rents an apartment located at 1034 Front Street, Lāhainā, Hawai'i, 96761, which the Lāhainā Fire destroyed. As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiff Heymes suffered personal property damages and personal injuries, including emotional distress.

22.     Plaintiff Jennifer Lynn McNamee rented a home located at 239 Front Street, Lāhainā, Hawaiʻi, 96761, which the Lāhainā Fire destroyed.

23.     As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiff McNamee suffered personal property damages, business losses, and personal injuries, including emotional distress.

24.     Plaintiff Chardell Naki was at all times relevant a resident of Maui County, State of Hawaiʻi. Plaintiff Naki rented a residence at 737 Mill Street, Lāhainā, Hawaiʻi, 96761.

25.     As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiff Chardell Naki suffered personal property damages, as well as personal injuries, including emotional distress.

26.     Plaintiff Rolland Williams, Jr. rented a home located at 1337 Hoapili Street, Lāhainā, Hawaiʻi, 96761, which the Lāhainā Fire destroyed.

27.     As a result of the Lāhainā Fire and Defendants' negligent, careless, reckless, and/or intentional conduct, Plaintiff Williams suffered personal property damages and business losses.

**B.      Defendants.**

28.     Defendant Hawaiian Electric Company, Inc. dba Hawaiian Electric ("HECO") is a Hawaiʻi domestic corporation with its principal place of business in the State of Hawaiʻi, registered on or about October 13, 1891. HECO is the Principal Subsidiary of Defendant Hawaiian Electric Industries, Inc. Defendant HECO is a public utility company headquartered in Honolulu, Hawaiʻi that owns, controls, operates, and/or manages one or more energy plant and equipment that is directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the State of Hawaiʻi pursuant to HRS chapter 269. Defendant HECO is the parent company of Defendants Maui Electric Company and

Hawai'i Electric Light Company, Inc. Defendant HECO does regular, sustained business throughout Hawai'i, including in Maui County. Its principal place of business is in Honolulu at 820 Ward Avenue, Honolulu, Hawai'i, 96814.

29.     Defendant Maui Electric Company, Inc. dba MECO ("MECO") is a Hawai'i domestic for profit corporation registered on or about April 28, 1921, with its principal place of business in Maui County, State of Hawai'i. Defendant MECO owns, controls, operates, and/or manages one or more energy plant and equipment that is directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the State of Hawai'i pursuant to HRS chapter 269. Its principal place of business is in Maui County at 210 Kamehameha Avenue, Kahului, Hawai'i, 96732.

30.     Defendant Hawai'i Electric Light Company, Inc. ("HELCO") is a Hawai'i domestic company with its principal place of business in Hawai'i County, State of Hawai'i. Defendant HELCO is a public utility company headquartered in Honolulu, Hawai'i that owns, controls, operates, and/or manages one or more energy plant and equipment that is directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the State of Hawai'i pursuant to HRS chapter 269. It does regular, sustained business throughout Hawai'i, including in Maui County. Its principal place of business is at 54 Halekauila St., Hilo, Hawai'i, 96720.

31.     Defendant Hawaiian Electric Industries, Inc. ("HEI") is a Hawai'i domestic company with its principal place of business in Honolulu County, State of Hawai'i. Defendant HEI is the parent company of HECO, MECO, and HELCO, and does business in the State of Hawai'i, including the County of Maui. Plaintiffs are informed and believe that HEI is a publicly traded, investor-owned utility company that owns, controls, operates, and/or manages one or

more energy plant and equipment that is directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the State of Hawai'i pursuant to HRS chapter 269. Defendant HEI is in the business of providing electricity to the residents of Maui County, including, but not limited to, those residing in Lāhainā and Kula through a network of electrical transmission and distribution lines. It is the largest supplier of electricity in the State of Hawai'i. Defendant HEI does regular, sustained business throughout Hawai'i, including in Maui County. Its principal place of business is in Honolulu at 1001 Bishop Street, Suite 2900, Honolulu, Hawai'i, 96813.

32.     Defendants HECO, MECO, HELCO, and HEI are collectively referred to herein as the "HECO Defendants."

33.     The HECO Defendants serve about 95% of the population of the State of Hawai'i with public utility services and services relating to the generation of energy, transmission of electricity, generation of electricity, and distribution of energy. Collectively, the HECO Defendants own about 3,000 miles of electrical transmission and distribution lines in the State of Hawai'i. Further, Defendant HECO is the sole owner of 50,000 utility poles.

34.     Plaintiffs allege on information and belief that the HECO Defendants are jointly and severally liable for each other's negligence, conduct, and wrongdoing as alleged herein, in that:

    a.    HEI is the sole holder of HECO common stock;

    b.    HECO, MECO, and HELCO operate as a single business enterprise operating out of the same building, located at 1099 Alakea Street, Suite 2200, Honolulu, Hawai'i, 96813 for the purpose of effectuating and carrying out HEI's business and operations and/or for the benefit of HEI;

    c.    The HECO Defendants do not operate as completely separate entities, but, rather, integrate their resources to achieve a common business purpose;

d.       HECO, MECO, and HELCO are organized and controlled, and their decisions, affairs, and business so conducted, as to make them a mere instrumentality, agents, conduits, or adjuncts of HEI;

e.       HECO, MECO, and HELCO's income contribution results from function integration, centralization of management, and economies of scale with HEI;

f.       The HECO Defendants' officers and management are intertwined and do not act completely independent of one another;

g.       The HECO Defendants' officers and managers act in the interest of HEI as a single enterprise;

h.       HEI has control and authority to choose and appoint HECO, MECO, and HELCO board members, as well as officers and managers;

i.       The HECO Defendants do not compete with one another but have been structured, organized, and integrated as a single enterprise where various components operate in concert with one another;

j.       HEI maintains unified administrative control over HECO, MECO, and HELCO;

k.       The HECO Defendants share the same insurance carriers and provide uniform or similar employee benefit plans;

l.       The HECO Defendants have unified personnel policies and practices; and

m.       HEI's written guidelines, policies, and procedures control HECO, MECO, and HELCO, and their employees, policies and practices.

35.     Defendant Trustees of the Estate of Bernice Pauahi Bishop ("Bishop Estate") is a charitable trust established pursuant to the laws of the State of Hawai'i. The Bernice Pauahi Bishop Estate is the largest private landowner in the Hawaiian islands.

36.     Defendant County of Maui ("Maui County") is, and was at all times relevant herein, a municipality organized and existing under the laws of the State of Hawai'i and the United States of America.

37.     Defendant Hawaiian Telcom, Inc. is a Hawai'i domestic company with its principal place of business in Honolulu County, State of Hawai'i. Its purpose is providing integrated communications, technology, and entertainment solutions for business and residential

customers. Its principal place of business is in Honolulu at 1177 Bishop Street, Suite 15, Honolulu, Hawai'i, 96813.

38.     Defendant Hawaiian Telcom Federal, LLC is a Delaware limited liability company and doing business in the State of Hawai'i.

39.     Defendant Hawaiian Telcom Communications Inc. is a Delaware corporation and doing business in the State of Hawai'i.

40.     Defendants Defendant Hawaiian Telcom, Inc.; Hawaiian Telcom Communications Inc.; and Hawaiian Telcom Federal, LLC are collectively referred to herein as "Hawaiian Telcom."

41.     Defendant Spectrum Oceanic, LLC ("Spectrum") is a Delaware limited liability company and doing business in the State of Hawai'i.  Its stated purpose is cable telecommunications.

42.     Spectrum, and Hawaiian Telcom are collectively referred to herein as "Telecommunication Defendants."

43.     Plaintiffs are informed and believe that Telecommunication Defendants are public utilities because they are corporate persons or limited liability entities composed of persons that own, control, and/or manage one or more plants and/or equipment that is directly or indirectly for public use for the conveyance or transmission of telecommunications messages in the State of Hawai'i pursuant to HRS chapter 269.

44.     Plaintiffs are informed and believe that "West Maui Land Company" is comprised of at least the following individuals and/or entities that owned, developed, or managed land in and/or adjacent to Lāhainā:

a. Defendant Peter Klint Martin; and Defendant Peter Klint Martin Revocable Trust. Plaintiffs are informed and believe that these persons and/or entities are residents of and/or doing business in the State of Hawai'i, County of Maui.

b. Defendant Hope Builders Inc. is a Hawai'i domestic company with its principal place of business in Maui County, State of Hawai'i. Its purpose is home construction. Its principal place of business is in Kahului at 305 E Wakea Ave., Ste. 100 Kahului, Hawai'i, 96732.

c. Defendant Makila Ranches, Inc. is a Hawai'i domestic company with its principal place of business in Maui County, State of Hawai'i. Its purpose is real estate development. Its principal place of business is in Kahului at 305 E Wakea Ave., Ste. 100 Kahului, Hawai'i, 96732.

d. Defendant West Maui Land Company, Inc. is a Hawai'i domestic company with its principal place of business in Maui County, State of Hawai'i. Its purpose is real estate brokerage and management. Its principal place of business is in Kahului at 305 E Wakea Ave., Ste. 100 Kahului, Hawai'i, 96732.

e. Defendant Hope Builders Holding LLC; Defendant Hope Builders LLC; Defendant Kauaula Land Company LLC; Defendant Kipa Centennial, LLC; Defendant Makila Land Co., LLC; and Defendant Wainee Land & Homes, LLC are domestic limited liability companies with their principal place of business in Maui County, State of Hawai'i. Their principal place of business is in Kahului at 305 E Wakea Ave., Ste. 100, Kahului, Hawai'i 96732.

45.     Defendant Makila Ranches Homeowners Association, Inc. is a Hawai'i domestic company with its principal place of business in Honolulu County, State of Hawai'i. Its purpose is as a homeowners association. Its principal place of business is in Honolulu at 737 Bishop St., Mauka, Ste. 3100, Honolulu, Hawai'i, 96813.

46.     Defendant JV Enterprises, LLC, is an Idaho limited liability company doing business in Hawai'i as JV Waiwai Investments. Its principal place of business is in Idaho Falls, Idaho.

47.     Plaintiffs are informed and believe that the following individuals and/or entities that owned, developed, or managed land in and/or adjacent to Lāhainā: Defendant James C. Riley Trust and Defendant Jeanne A. Riley Trust.

48.     Defendant West Maui Land Company; Defendant Makila Ranches Homeowners Association, Inc.; Defendant JV Enterprises, LLC; Defendant James C. Riley Trust; and Defendant Jeanne A. Riley Trust are collectively referred to herein as "West Maui Landowner Defendants."

49.     Plaintiffs have reviewed available records to ascertain the true and full names and identities of all defendants in this action, but no further knowledge or information regarding the parties responsible is available at this time. Plaintiffs are unable to ascertain the identity of the defendants in this action designated as Doe Defendants 1–10 ("Doe Defendants").

50.     Doe Defendants are sued herein under fictitious names because their true names and identities are unknown to Plaintiffs, except that they may be connected in some manner with Defendants and may be agents, attorneys, servants, employees, employers, representatives, co-venturers, co-conspirators, associates, or independent contractors of Defendants and/or were in some manner jointly and severally responsible for the injuries or damages to Plaintiffs, and their true names, identities, capacities, activities and responsibilities are presently unknown to Plaintiffs or their attorneys.

**JURISDICTION AND VENUE**

51.     This Court has original jurisdiction over the above Defendants pursuant to 28 U.S.C. § 1332(d)(2) & (5)(B). Specifically, this matter is a class action where "the class has more than 100 members, the amount in controversy is greater than $5,000,000, and the parties are minimally diverse." *Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*, 761 F.3d 1027, 1039 (9th Cir. 2014); *see also* ECF No. 67. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because this District is "a judicial district in which a substantial part of the events or omissions

giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

## FACTUAL ALLEGATIONS

**A.    The HECO and Telecommunications Defendants had a duty to safely design, build, maintain, and operate their overhead electrical and communications infrastructure.**

52.    Collectively, the HECO Defendants are a multibillion-dollar corporation that supplies electricity throughout Hawaiʻi. The HECO Defendants own, build, operate, and maintain power lines, power poles, and other electrical equipment and infrastructure to transmit power to residents, businesses, schools, and other entities in Hawaiʻi. The HECO Defendants own, maintain, and operate equipment throughout Hawaiʻi, including in and around the Lāhainā Fire's area of origin, as well as the areas of origin of simultaneous fires in Kula and Kīhei.

53.    As the HECO Defendants know, power line infrastructure carries inherent dangers. The inherent and heightened danger associated with the transmission and distribution of electricity requires the HECO Defendants to exercise an increased level of care to protect the public and the communities through which their power lines run.

54.    Hawaiʻi law recognizes these dangers and mandates that Defendants, as public utilities, must "exercise reasonable care to reduce the hazards to which [their] employees, [their] customers, and the general public may be subjected." Haw. P.U.C. Gen. Order No. 7, § 8.2.a.

55.    Hawaiʻi law requires the HECO Defendants to take common sense preventative actions to protect against the known risk of fire. The HECO Defendants have a duty to properly construct, inspect, repair, maintain, manage, and operate their power line infrastructure. Haw. Admin. R. ("HAR")  § 6-73-11; Nat'l Elec. Safety Code ("NESC") § 214(A).

56.     With regard to their power poles specifically, the HECO and Telecommunications Defendants have a duty to ensure the poles can withstand wind speeds of up to 105 miles per hour. HAR § 6-73-11; NESC § 250-2(b) (2002).

57.     The HECO Defendants also have a duty to keep vegetation properly cleared at a safe distance to prevent contact with power line infrastructure. HAR § 6-73-11; NESC § 217(A).

58.     The Telecommunications Defendants share the duty to keep vegetation properly cleared at a safe distance to prevent contact with electrified infrastructure. Pursuant to their respective license agreements for pole attachments with the HECO Defendants, the Telecommunications Defendants own and operate telecommunications equipment attached to the HECO Defendants' power pole infrastructure on Maui. Under the Pole Licensing Agreement, the Telecommunications Defendants and HECO Defendants are jointly responsible for performing proactive and corrective vegetation management in the areas surrounding their shared equipment.

59.     The Telecommunications Defendants are also responsible for properly designing, constructing, installing, using, inspecting, repairing, and adequately maintaining their telecommunications equipment attached to the HECO Defendants' power poles. This duty includes a duty to design, maintain, and inspect their communications equipment so as to not overload the poles or otherwise cause the shared poles to break, snap, and/or fail during wind events.

60.     If Defendants start a fire, they have a duty to extinguish that fire or to use every reasonable effort to do so.

**B.     Defendants were aware of the heightened risk of wildfire in West Maui that extreme weather and overgrown vegetation posed.**

61.     Defendants knew about the fire risks that the HECO Defendants' aging power line infrastructure posed. Numerous government and independent reports have recognized that

Hawaiʻi's electrical infrastructure, in conjunction with extreme weather and overgrown vegetation, poses real and significant wildfire threats.

62.     West Maui is generally at risk for wildfires because of its microclimate and terrain. A decade ago, the Hawaiʻi Wildfire Management Organization ("WMO") issued a Wildfire Mitigation Plan, cautioning that Lāhainā's proximity to grasslands, steep terrain, and frequent high winds makes it particularly susceptible to wildfire.[3]

63.     The risk of high winds and rapidly spreading fire become even more severe during tropical storms, such as hurricanes. Climate change has made hurricanes more frequent and their effects more severe. Since 2000, at least twenty-two hurricanes or their remnants have either impacted or nearly impacted Hawaiʻi, thirteen of which occurred since 2010.

64.     Hawaiʻi wildfire experts have also repeatedly singled out better management of nonnative grasses as key to mitigating fire risk.[4]

65.     These invasive, nonnative grasses, such as buffelgrass and guinea grass, have thrived in Maui's climate at the expense of native species of plants. Overgrowth of nonnative grasses is especially pronounced in former sugarcane plantation fields and in areas that burned in a prior fire.

---

[3] Dan Frosch & Jim Carlton, *Hawaii Officials Were Warned Years Ago that Maui's Lahaina Faced High Wildfire Risk*, WALL ST. J. (Aug. 11. 2023), https://www.wsj.com/articles/hawaii-maui-fire-risks-plans-government-e883f3a3.

[4] Imogen Piper et al., *Maui's neglected grasslands caused Lahaina fire to grow with deadly speed*, WASH. POST, (Sept. 2, 2023), https://www.washingtonpost.com/investigations/interactive/2023/lahaina-wildfires-invasive-grass-destruction/; Melissa Tanji, *Wildfire Lessons Learned*, MAUI NEWS (Sept. 30, 2018) https://www.mauinews.com/news/local-news/2018/09/wildfire-lessons-learned/.

66.     If unchecked, and with little competition from native plants, these nonnative grasses can grow quickly to form an exceptionally dense underbrush that inches taller and closer to homes every rainy season.

67.     After the extended drought that preceded the Lāhainā Fire, these grasses dried out and essentially turned into kindling that, according to an expert, facilitated "explosive fire growth."[5]

68.     The danger that drought and nonnative grasses present was well known. In 2019, the Hawai'i Wildfire Management Organization published a report with multiple recommendations, including fuel reduction; replacement of invasive, fire-promoting grasses to less flammable species; and construction of fire breaks in the area where the Lāhainā Fire started.[6]

69.     The Maui County Cost of Government Commission reiterated these conclusions regarding vegetation management in its 2021 Report on Wildfire Prevention and Cost Recovery.[7]

---

[5] Dan Frosch & Jim Carlton, *Hawaii Officials Were Warned Years Ago that Maui's Lahaina Faced High Wildfire Risk*, WALL ST. J. (Aug. 11, 2023), https://www.wsj.com/articles/hawaii-maui-fire-risks-plans-government-e883f3a3.

[6] Cnty. of Maui, State of Hawai'i, Cost of Gov't Comm'n, *Report on Wildfire Prevention and Cost Recovery on Maui, Exhibit D: Hawaii Wildfire Management Association, A Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawai'i: 2018–19 Vegetation Management — Rapid Mapping Assessment and Collaborative Action Planning — Maui Report*, https://www.mauicounty.gov/DocumentCenter/View/129491/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-4-Exhibit-D-25-MB ("Cost of Gov't Comm'n, Ex. D").

[7] *Id.*



*A slide authored by the Hawaii Wildfire Management Association from the Maui County Cost of Government Commission's "2021 Report on Wildfire Prevention and Cost Recovery."[8]*

70.     Under these conditions, wildfires were commonplace in West Maui prior to the Lāhainā Fire. The hazard mitigation plan prepared for Defendant Maui County in 2020 reported that West Maui, which includes Lāhainā, had the highest annual probability for wildfires of all communities in the County. The plan listed West Maui as having a "highly likely" probability—i.e., a more than 90 percent chance—of wildfires each year.

71.     Defendants were also no doubt aware of the threat of fire based on recent experience. The worst fires in recent memory to occur prior to the Lāhainā Fire happened in

---

[8] *Id.* at 2.

2018, when Hurricane Lane triggered fires that burned through 2,100 acres of overgrown vegetation, caused more than $4.3 million in damage, and destroyed 21 houses and 27 cars.



*A slide authored by the Hawaii Wildfire Management Association's*
*2018 Collaborative Action Planning Workshop on Vegetation Management.*[9]

72.     These fires led to greater study and knowledge of the conditions that could lead to more destructive wildfires in West Maui, including findings that suggested that Defendants were to blame for that fire as well.

73.     In 2020, the University of Hawaiʻi and East-West Center researchers published a report entitled "Fire and Rain: The Legacy of Hurricane Lane in Hawaiʻi," in the American Meteorological Society's Journal. This report linked fires in Maui and Oʻahu to Hurricane

---

[9] *Id.* at 7.

Lane's winds. The Honolulu Fire Department identified power lines arcing in Hurricane Lane's high wind gusts as the ignition source for those fires.

74.     In July 2021, Defendant Maui County issued its Wildfire Prevention Report. It observed that above-ground power lines pose a risk of igniting wildfires, "particularly in windy or stormy conditions." The report also included electrical "infrastructure upgrades" as part of its "long-term solutions for reducing power line-related wildfire hazards."[10]

75.     Consistent with state and local authorities, FEMA's April 2023 Wind Retrofit Guide for Residential Buildings in Hurricane-Prone Regions designates the entirety of Hawai'i as a hurricane-prone region at risk of significant high-wind hazards, including wildfires. Moreover, the HECO Defendants' own statements show they knew about the risks their aging electrical infrastructure posed.

76.     In November 2019, HECO's Resilience Working Group recognized wildfires as one of HECO's major vulnerabilities. The group identified hurricanes as a possible condition that could "damage power lines and poles in fire prone areas." The group recommended grid "system hardening" to "[i]ncrease[] wind withstand ratings" by reinforcing overhead power lines or replacing them with underground cabling.

---

[10] *See generally* Cnty. of Maui, State of Hawai`i, Cost of Gov't Comm'n, *Report on Wildfire Prevention & Cost Recovery on Maui* (July 2021), https://www.mauicounty.gov/179/Cost-of-Government-Commission (last visited Aug. 27, 2023).



77.     In April 2020, HECO's Resilience Working Group recognized that "frequency and impacts of wildfires have increased recently" and concluded that the risk to HECO's grid from wildfires was "most prevalent in Maui and Oʻahu."

78.     In 2022, HECO submitted a request for funding from the Public Utilities Commission. That request acknowledged the need to bolster HECO's power grid statewide and implement wildfire-prevention measures. In its submission, HECO admitted that "[t]he risk of a utility system causing a wildfire ignition is significant" and that its systems could be "the origin or contributing source of ignition for a wildfire."

79.     Knowledge of these conditions was not exclusive to those who had read academic articles or government reports. The risk of wildfires and the conditions that gave rise to them were familiar to anyone who lived, worked, or owned land on Maui, including Defendants.

**C.     The HECO Defendants failed to properly inspect, maintain, test, and operate their electrical systems and infrastructure.**

80.     The HECO Defendants knew their electrical infrastructure was inadequate, aging, and posed a risk of sparking wildfires. In 2017, they hired Ward Research Incorporated to conduct a study of HECO's aging infrastructure. Ward concluded that the HECO Defendants'

"electric grid needs to be modernized" and their "old electric poles and 'messy' wires" needed upgrading "to better withstand inclement weather."



*Broken utility pole on Maui on Friday, August 11, 2023.*[11]

81.     In their 2017 grid modernization plan, the HECO Defendants acknowledged their "aging grid infrastructure" created a "need to modernize." They also recognized that deteriorating infrastructure "leads to failure."

82.     Failures of the HECO Defendants' overhead electrical infrastructure, such as broken power poles and downed power lines, create the risk of igniting dry vegetation. In light of these risks, other utilities—including all of California's major utilities—have implemented wildfire mitigation plans that include Public Safety Power Shutoff ("PSPS") programs for preventively de-energizing power lines during High Wind and Red Flag conditions. PSPS plans are a necessary wildfire mitigation tool, especially to protect against risks aging infrastructure poses.

---

[11] Ivan Penn, *Fire danger was high, but Maui's electric utility opted not to cut power*, N.Y. TIMES (Aug. 12, 2023 7:29 PM ET), https://www.nytimes.com/live/2023/08/12/us/maui-wildfires-hawaii-news.



*A still image from a video taken by local resident Shane Treu, showing downed power lines next to a fire near the Area of Origin.*[12]

83.     According to the Associated Press, the HECO Defendants' "own documents described [their power poles] as built to 'an obsolete 1960s standard,'" and "were leaning and near the end of their projected lifespan." These aging poles "were nowhere close to meeting a 2002 national standard that key components of Hawaii's electrical grid be able to withstand 105 mile per hour winds."[13]

84.     In 2019, the HECO Defendants issued a Press Release expressing their purported commitment to upgrade their electrical infrastructure and protect the public. The Release claimed

---

[12] Michael Biesecker et al., *Videos Put Scrutiny on Downed Power Lines as Possible Cause of Deadly Maui Wildfires*, AP NEWS, (Aug. 16, 2023, 2:44 AM HST), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-c46a106db3c5019ac835ddcb01fde25f.

[13] Jennifer McDermott & Jennifer Sinco, ASSOC. PRESS (Aug. 28, 2023), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-1741e22bbf955b62103db6b60f5c4853; *see also* Nat'l Elec. Safety Code § 250-2(b) (2002) (referring to 105 mile per hour standard for Hawai'i).

the HECO Defendants were undertaking a "proactive assessment and management of vegetation near their electrical infrastructure, especially in drought-prone or dry brush areas." It also announced that the HECO Defendants had studied wildfire mitigation plans by California's major utilities, which include PSPS plans.[14] Despite their published awareness that power shut-offs are an effective strategy to mitigate wildfire risks, the HECO Defendants never created a PSPS plan.

85.     Jennifer Potter, a member of the Hawai'i Public Utilities Commission who lived in Lāhainā, confirmed that Defendants knew about Maui's high wildfire risk: "There was absolutely knowledge within the state and within the electric industry that fire was a huge, huge concern on the island of Maui, and even more so than any of the other islands."[15]

**D.     The Telecommunications Defendants failed to meet their joint responsibility to ensure public safety, including by managing overgrown vegetation and ensuring their communications equipment did not overload HECO's poles.**

86.     Each of the Telecommunications Defendants executed agreements with the HECO Defendants licensing their joint use of HECO's wood power poles on Maui.

87.     These agreements assign a joint duty between the HECO Defendants and each Telecommunications Defendant to properly design, construct, install, use, inspect, repair, and adequately maintain their telecommunications equipment attached to the HECO Defendants' wood power poles, in a way that would not overload those poles and cause them to break, snap, and fail during a high-wind event.

---

[14] Press Release, Haw. Elec. Co. et al., Hawaiian Electric Companies to Conduct Drone Surveys as Part of Overall Wildfire Mitigation (Nov. 5, 2019), planninghttps://www.hawaiianelectric.com/documents/about_us/news/2019/20191105_hawaiian _electric_companies_fire_mitigation.pdf.

[15] Dan Frosch & Jim Carlton, *Hawaii Officials Were Warned Years Ago that Maui's Lahaina Faced High Wildfire Risk*, WALL ST. J. (Aug. 11, 2023), https://www.wsj.com/articles/hawaii-maui-fire-risks-plans-government-e883f3a3.

88.     These agreements also specifically assign a joint duty between the HECO Defendants and each Telecommunications Defendant to maintain vegetation near the power poles to mitigate the risk of wildfire in the event of a fault.

89.     In 2018, the HECO Defendants and Hawaiian Telcom sought and received approval from the HPUC to transfer Hawaiian Telcom's ownership interest in jointly-owned poles to the HECO Defendants and for the HECO Defendants and Hawaiian Telcom to enter into a subsequent pole licensing agreement.[16]

90.     Hawaiian Telcom and the HECO Defendants represented to the HPUC that a "single managing owner of distribution poles and third-party attachments is designed to help *minimize potential safety risks* by establishing and applying uniform engineering design and standards across all distribution poles in all of the Hawaiian Electric Companies' operating territories. Pre- and post-construction inspections, *vegetation management*, and double pole remediation should enhance public safety."[17]

91.     The approved pole licensing agreement between Hawaiian Telcom and the HECO Defendants includes a clause that states that each party has responsibility for maintenance of "its wires, cables, crossarms, fixtures and appurtenances on any jointly-occupied pole in a safe condition, . . . ."[18] This assignment of responsibilities with respect to maintenance clearly creates a duty to avoid the overloading of power poles without adequate support.

---

[16] Decision and Order No. 35768, *In the Matter of Application of Hawiian Telcom, Inc. et al.*, No. 2018-0075 (Haw. Pub. Utilities Comm'n Oct. 16, 2018).

[17] Application, *In the Matter of Application of Hawiian Telcom, Inc. et al.*, No. 2018-0075 at 22 (Haw. Pub. Utilities Comm'n Apr. 4, 2018).

[18] Ex. C to Application at 5, *In the Matter of Application of Hawiian Telcom, Inc. et al.*, No. 2018-0075 (Haw. Pub. Utilities Comm'n Apr. 4, 2018).

92.     The Telecommunications Defendants breached this duty by overloading HECO

Defendants' power poles near the Area of Origin, including Pole 7A, pictured below. Pole 7A

was placed on Hoʻokahua Street at its intersection with Lahainaluna Road. Plaintiffs believe that

this pole was the first wood power pole to break and fall  in the Area of Origin, causing

energized power lines to fall into dry vegetation below and, ultimately, starting the Lāhainā Fire.



93.     Pole 7A appears obviously overloaded with power and telecommunications

equipment. This overloading caused significant tension in the lines, leading to the pole's

instability in high-wind conditions. The tension from the overloading of equipment is apparent in

the lack of visible slack in the lines. The absence of slack that would ordinarily afford the poles

and lines some movement in high-force winds compromised the structural integrity of Pole 7A.

Plaintiffs believe that Pole 7A snapped around 3 a.m. on August 8, 2023, damaging the cross-

arms of Pole E7B.

94.     The above image also shows other obvious structural issues with Pole 7A, including a slight downhill tilt to Pole 7A. Additionally only one guy wire supports the pole.  A guy wire is a steel cable, with one end anchored in the pole and the other end anchored in the ground. Multiple guy wires improve the structural integrity and wind resistance of a power pole and help keep the pole upright in high-wind conditions, like the winds on August 8, 2023. The guy wire on Pole 7A, depicted in the image above, was installed parallel to the overhead communications and power lines attached to the pole. The Telecommunications Defendants failed to install additional guy wires on the east (uphill) side of Pole 7A to counteract the weight and tension of the communications cables attached to the west (downhill) side of this pole. The Telecommunications Defendants had a duty to design and attach their equipment to HECO's pole in a safe manner, pursuant to their pole licensing agreements with the HECO Defendants. Apparently, the Telecommunications Defendants failed to perform these obligations.

95.     Given the obvious overloading of the pole, the age of the pole, and the frequency of high-wind conditions known to affect Lāhainā, the HECO Defendants and Telecommunications Defendants' use of single guy wire to stabilize Pole 7A was woefully inadequate to fulfill their duty to protect public safety and meet NESC standards for safety and 105 mile-per-hour wind resistance.

96.     The pole licensing agreements also impose duties regarding vegetation management on the Telecommunications Defendants as well. The approved pole licensing agreement between Hawaiian Telcom and the HECO Defendants also contain a "Vegetation Trimming" clause, which states that "[j]oint trimming of vegetation will be on a 50/50 basis and a contractor will trim whenever possible."[19]

---

[19] Ex. C to Application at 6, *In the Matter of Application of Hawiian Telcom, Inc. et al.*, No.

97.      Similarly, Spectrum Oceanic, LLC's January 2020 pole licensing agreement with the HECO Defendants also contemplates that the "Companies will be responsible for and perform proactive and corrective Vegetation Management around electric cables and the Power Space on Utility Poles and the Lighting Space on Streetlight Poles." This includes "[p]roactive and corrective Vegetation Management on and around the Poles" and "Corrective Vegetation Management in the Communications Space and around Licensee's Communications Facilities when the Companies become aware of a condition that threatens the physical integrity of the Poles and/or . . . has the potential to impact public safety or reliable delivery of electric service."

98.      These vegetation maintenance clauses create a joint duty, requiring Hawaiian Telcom and the HECO Defendants to maintain vegetation on the licensed power poles. Both Defendants breached this duty by failing to trim vegetation around the power poles, which provided the initial fuel for wildfires caused by arcing cables that hit overgrown vegetation.

**E.    The County failed to exercise its authority to create a fire prevention strategy, manage overgrowth of nonnative grasses, or implement improvements to its emergency warning systems after Hurricane Lane.**

99.      These resident complaints, in conjunction with the various governmental sources cited above, show that these issues and possible solutions were known to the County. In a 2021 report by the County's Cost of Government Commission, the Commission stated a continued need for "a fire prevention strategy" to complement "a fire response plan," as "any plan to reduce wild/brush/forest fires must incorporate both prevention and response." The report also described the legal authority for enforcement of that strategy through existing law, specifically HRS §§ 132-6 and 132-7.

---

2018-0075 (Haw. Pub. Utilities Comm'n Apr. 4, 2018).

100.    Despite the County's clear knowledge of the need and its authority for regulatory enforcement to mitigate fire risk, the report also confirms the County's refusal to prioritize fire prevention. It states that "[t]he [Maui County Fire] Department's new strategic plan [for 2021-2025] fails to address fire prevention as a mission or goal, a significant oversight." It also notes the absence of any "stated goal of fire prevention, or any metric to assess success or improvement in prevention." [20]

101.    Additionally, although the County's own publications confirmed the need for removal of vegetation from private properties, its 2021 report stated that "MFD and County personnel have confirmed that clearing potential fire hazards from private properties is uncommon." Despite a clear responsibility to address overgrown vegetation and nonnative grasses in particular, the County failed to do so for mystifying reasons. According to the same report, "[t]he reason for the infrequent cleanup . . . is not entirely clear."[21]

102.    Mere days after Hurricane Lane, Maui residents raised eerily prescient concerns with County officials at a public town hall: Why did the hydrants run out of water? Why didn't the HECO Defendants shut off the power given the high winds and the past fires started by their equipment? Why didn't emergency officials sound the all-hazard sirens? Officials had no answers to these pointed questions: They provided no explanation for the lack of water, the absence of protocols for sounding the County's alarm for wildfires, or the decision not to shut off the power in advance of high winds. [22]

---

[20] Cnty. of Maui, State of Hawai`i, Cost of Gov't Comm'n, *Report on Wildfire Prevention & Cost Recovery on Maui*, at 9-10 (July 2021), https://www.mauicounty.gov/DocumentCenter/View/129493/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-1-Report--Exhibits-A-B-33-MB
[21] *Id.* at 9.

[22] Brianna Sacks & Justine McDaniel, *A Terrifying Fire Struck Maui in 2018. Officials Were Warned of a Repeat.*, WASH. POST (Aug. 22, 2023),

103.    Residents would continue to confront County leaders in subsequent years leading up to the Lāhainā Fire. Nevertheless, five years later, the hydrants again ran dry, no emergency warning siren sounded, and no de-energization protocol existed for high-wind conditions. This time, those omissions would result in far more widespread and deadly destruction.[23]

## F.    The Bishop Estate and West Maui Landowner Defendants failed to perform adequate vegetation management, which fueled the Lāhainā Fire.

104.    Vegetation management is critical in wildfire-prone areas such as West Maui because dry brush is a ready source of fuel for fires that failing power infrastructure cause. The 2018 Hurricane Lane fires demonstrated to local landowners how proliferation of nonnative grasses could fuel particularly devastating wildfires that spread rapidly.

105.    The Bishop Estate and the West Maui Landowner Defendants were two of the top three landowners of nonnative grasslands near Lāhainā. Thus, they owed a duty to the public to perform adequate vegetation management of their land and to avoid contributing fuel to wildfires.

106.    But after the cautionary tale of the Hurricane Lane fires only five years earlier, the Bishop Estate and West Maui Landowner Defendants failed to conduct adequate vegetation management. Instead, these landowners left their lands unmanaged, to become overgrown with highly flammable, nonnative vegetation. These Defendants also further failed to implement adequate fire mitigation measures, including by failing to install proper fire breaks.

107.    As a result of the Bishop Estate and West Maui Landowner Defendants' failure to adequately maintain vegetation on their lands, the Lāhainā Fire raced across Defendants' overgrown and fallow fields. These "vast swath[es] of vegetated fuels" were like "match sticks"

---

https://www.washingtonpost.com/weather/2023/08/22/maui-fire-2018-lahaina-warning/.

[23] Sacks & McDaniel, *supra*.

for wildfires and created a situation where "[t]he town was basically surrounded by a powder keg waiting to go off with a spark."[24]

108.   County records show that Bishop Estate failed the fire brush inspection of its parcel, at the Area of Origin, on April 20, 2020. Maui County Code section 10.13.10.2.1 details several requirements that landowners must follow regarding clearance of brush to prevent wildfires and protect public safety. These requirements include maintenance of an effective firebreak, by both removing and clearing away flammable vegetation and combustible growth from designated areas and from within 30 feet of buildings or structures and by removing grass and other vegetation taller than 18 inches above the ground.

109.   By violating the County code, the Bishop Estate also breached its duty to the Class, the very people the code was designed to protect. This code violation also demonstrates Bishop Estate's failure to implement proper vegetation management practices preceding the Lāhainā Fire. Even after the fire, Bishop Estate has twice failed County fire brush inspections, on September 26, 2023, and again on May 21, 2024.

110.   Landowner failures to practice adequate vegetation management when they were aware (or should have been aware) that the nonnative grasses on their lands were fuel for wildfires was a clear breach of duty. Bishop Estate's and the West Maui Landowner Defendants' mismanagement resulted in an "avoidable tragedy," as described in a public letter by a former

---

[24] Piper et al., *Maui's Neglected Grasslands Caused Lahaina Fire to Grow with Deadly Speed*, Wash. Post (Sept. 2, 2023), https://www.washingtonpost.com/investigations/interactive/2023/lahaina-wildfires-invasive-grass-destruction/; Melissa Tanji, *Wildfire Lessons Learned*, Maui News (Sept. 30, 2018) https://www.mauinews.com/news/local-news/2018/09/wildfire-lessons-learned/.

Hawaiʻi forestry official. "No landowner, public or private, should be allowed for any reason to maintain hundreds of acres of flammable grass and fuel that threaten the lives of citizens."[25]

**G.    Defendants were aware that all the factors necessitating power shutoffs were present on August 8, 2023, but failed to take reasonable precautions.**

111.    On August 4, 2023, the NWS in Honolulu posted on social media that Hawaiʻi could experience "indirect impacts" from Hurricane Dora from August 7 to August 9, including "strong and gusty trade winds" and "dry weather and high-fire danger."



112.    Two days later, on August 6, the NWS issued a fire weather watch and warned that: "Strongest winds in yellow and orange on map result from significant pressure differences between high and low pressures. Combined with dry conditions, these winds pose a serious fire and damaging wind threat. Stay alert!" The NWS also posted an update on Hurricane Dora on X

---

[25] Dan Frosch et al., *Everybody Knew the Invasive Grass of Maui Posed a Deadly Fire Threat, but Few Acted*, WALL ST. J. (Aug. 25, 2023), https://www.wsj.com/us-news/climate-environment/maui-fire-invasive-grass-cf6dbca2.

(formerly known as Twitter), which included the following warning: "While Hurricane Dora passes well south with no direct impacts here, the strong pressure gradient between it and the high pressure to the north creates a threat of damaging winds and fire weather (due to ongoing dry conditions) from early Monday to Wednesday."



113.    On August 7, 2023, the NWS issued an updated warning for the Hawaiian Islands, as reported in *The Maui News*. The updated warning contained both a High Wind Watch and a Fire Warning for the leeward sides of the islands, which includes Lāhainā. The warning cautioned that damaging and powerful winds could knock down power lines and that any fires that could develop would likely spread rapidly.[26]

---

[26] *National Weather Service Issues High Wind Watch, Fire Warning in Effect Through Late Tuesday*, MAUI NEWS, (Aug. 7, 2023), https://www.mauinews.com/news/local-news/2023/08/national-weather-service-issues-high-wind-watch-fire-warning-in-effect-through-late-tuesday/.

114.    On August 8, 2023, the NWS issued a High Wind Warning and a Red Flag

Warning for large swaths of the Hawaiian Islands, including West Maui. A Red Flag Warning

means that critical fire weather conditions are either occurring now or will shortly. The NWS

warned as follows: "High Wind: 30-45 miles per hour winds, gust up to 60 miles per hour. . . .

Red Flag: High fire danger with rapid spread. NO outdoor burning. Stay safe and cautious!"



115.    Despite their knowledge of High Wind and Red Flag warnings, the HECO

Defendants failed to implement reasonable fire mitigation measures and failed to de-energize

their power lines to reduce wildfire risks, as Maui residents had pleaded for them to do for the

past five years.

116.    Rather, even after detecting electrical faults from their power lines located—in the

Area of Origin—the HECO Defendants *re-energized* the circuit while their power lines were on

the ground.

H.     **Witness accounts, SCADA data, and Plaintiffs' analysis of evidence confirm that both the HECO Defendants and the Telecommunication Defendants' equipment started the Lāhainā Fire, which all Defendants' poor wildfire mitigation practices further intensified.**

117.    Late in the evening of August 7, 2023, remote energy grid sensors recorded the first faults in the HECO Defendants' power grid near Makawao. Faults typically occur when power lines come into contact with something else—often another power line, vegetation, or the ground—after being knocked down. This fault was the start of the Kula Fires, which began at approximately 10:47 p.m., when security camera footage at the Maui Bird Conservation Center captured a bright flash in the woods.[27]

118.    Shortly before midnight, residents reported another brush fire near Kula, close to Olinda Road. The Olinda Fire spread quickly, burning through more than 1,000 acres in the community of Kula and destroying multiple structures.

119.    Several hours later, at 3:19 a.m. on August 8, the HECO Defendants' Supervisory Control and Data Acquisition ("SCADA") data detected the first significant fault on the circuit that provided electricity to the power lines along Lahainaluna Road.  Two hours later, at 5:10 a.m., the HECO Defendants' Substation 34 (the substation closest to the Area of Origin) detected a fault condition, which tripped a circuit breaker and stopped energy from flowing through the circuit. Six minutes later, at 5:16 a.m., the Maui Fire Department reported broken power  poles and hanging wires on nearby Ku'ailua Street and requested that HECO respond.

120.    At 6:07 a.m., the HECO Defendants inexplicably closed the circuit breaker at Substation 34, re-energizing the downed power lines along Lahainaluna Road. The HECO

---

[27] Brianna Sacks, *Power Lines Likely Caused Maui's First Reported Fire, Video and Data show*, WASH. POST (August 16, 2023), https://www.washingtonpost.com/climate-environment/2023/08/15/maui-fires-power-line-cause/.

Defendants' SCADA data shows that this circuit breaker was "closed" (allowing the flow of electricity) between 6:07 a.m. and 6:41 a.m., when HECO finally opened the circuit after the fire was reported. At 6:37 a.m., residents reported a brush fire near Lahainaluna Road at the intersection of Hoʻokahua Street. This intersection was the Area of Origin of the Lāhainā Fire. Shortly after the brush caught fire, Shane Treu, a Lāhainā resident, posted a live video on social media showing a downed power line dangling near the fire. In the video, Mr. Treu reports that the power line was arcing, laying on the ground, and sparking.



*A downed power line observed by Mr. Treu.*[28]

    121.    The downed power line fell into overgrown, highly flammable material that sparked the fire and fueled its spread. According to Mr. Treu, the power line in dry grass was "like a fuse," and started a fire that quickly "blacken[ed] the ground at the base of a power pole" and began to ignite nearby land.

---

[28] Michael Biesecker et al., *Videos Put Scrutiny on Downed Power Lines as Possible Cause of Deadly Maui Wildfires*, at 00:18, AP NEWS, (Aug. 16, 2023, 2:44 AM HST), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-c46a106db3c5019ac835ddcb01fde25f.

122.     HECO has confirmed Mr. Treu's account and publicly admitted that the Fire "appears to have been caused by power lines that fell in high winds."[29]

123.     By 6:40 a.m., authorities ordered immediate evacuations in and around the areas surrounding the Lāhainā Intermediate School and closed Lahainaluna Road between Kelawea Street and Ku'ailua Street. Firefighters responded to the Fire, initially containing it by around 9:00 a.m. After determining the Fire was fully contained, firefighters left to fight other HECO-caused fires elsewhere on Maui.

124.     The HECO Defendants' decision to energize the circuit without patrolling their poles and power lines to identify the cause of the tripped circuit breaker, which would have revealed the broken Pole 7A and severed power lines between Pole Nos. 24 and 25, caused a chain reaction that ultimately caused the ignition of brush beneath Poles 24 and 25, as seen in Mr. Treu's video. As pictured below, there were several power poles connected to each other near the Area of Origin that would eventually lead to the devastating fire, including Poles 24, 25, and 7A:

---

[29] Press Release, Hawaiian Electric Provides Update on Lahaina Fires, Response, Hawaiian Elec. (Aug. 27, 2023), https://www.hawaiianelectric.com/hawaiian-electric-provides-update-on-lahaina-fires-response.



125.    As described earlier, based on their inspection of the damaged infrastructure, they Plaintiffs believe that Pole 7A may have been the first pole to fail structurally in the Area of Origin. The collapse of Pole 7A, which was overloaded and unsupported by adequate guy wires, resulted in breaks in the heavily tensioned lines connected to Pole 25. The breaks in the lines caused an energized conductor attached between Poles 24 and 25 to fall to the ground, resulting in the ignition of unmanaged vegetation at the bases of Pole 25, located on Bishop Estate land.

126.    By the afternoon, winds grew stronger, and the Lāhainā Fire rekindled on Bishop Estate land. Overgrown and unmanaged vegetation under Defendants' control appears to have been four feet tall in the area surrounding the Area of Origin.



*A parcel map showing the locations of Poles 7A and 25 relative to Bishop Estate Land.*

127.    Wind gusts pushed flames leeward, down the hillside near Lahainaluna Road and toward the coast and the historic town center. Overgrown, nonnative grasses on Bishop Estate land "were key elements to creating a fast-moving, uncontrollable fire."[30] The West Maui Landowner Defendants' properties are situated along Highway 30, but lacked adequate fire breaks that could prevent the spread of the Fire or open up potential escape routes. As the Hawaii Wildfire Management Association noted in 2021, adequately sized fire breaks not only stop wildfire from spreading, but they can also "serve as emergency egress when wildfire is coming from a different direction."[31] Had the West Maui Landowner Defendants installed adequate fire breaks on their land, those breaks may have opened up a potential south-bound escape route for Lāhainā residents. These Defendants' poor fire mitigation practices foreclosed that possibility.

---

[30] Imogen Piper et al., *Maui's Neglected Grasslands Caused Lahaina Fire to Grow with Deadly Speed*, WASH. POST, (Sept. 2, 2023), https://www.washingtonpost.com/investigations/interactive/2023/lahaina-wildfires-invasive-grass-destruction/.

[31] Cost of Gov't Comm'n, Ex. D at 4.



*Evacuations shown in orange. Initial fire path shown in red.*[32]

128.     The fast-approaching fire forced residents to flee with minimal notice. Maui has the world's largest integrated outdoor siren warning system, with more than 80 sirens on Maui alone, designed for use in natural disaster situations. Just as the County failed to activate its extensive network of sirens during the Hurricane Lane fires in 2018, it again failed to activate the sirens during the Lāhainā Fire. The County also failed to implement wireless emergency notifications until approximately 4:16 p.m., after the fire had begun moving through town and after wireless towers were already down.

129.     The HECO and Telecommunications Defendants' aging and dilapidated power poles and communications infrastructure continued to add to the chaos surrounding the Lāhainā

---

[32] Dan Frosch & Jim Carlton, *Hawaii Officials Were Warned Years Ago that Maui's Lahaina Faced High Wildfire Risk*, WALL ST. J. (Aug. 11, 2023), https://www.wsj.com/articles/hawaii-maui-fire-risks-plans-government-e883f3a3.

Fire, as downed power poles with wires still attached cut off two critical roads. Out of West

Maui's 750 poles, 400 were damaged or destroyed in the windstorm and fires; 300 out of 575

transformers were visibly damaged.



*Fallen utility pole observed by Plaintiffs Llamas and Procell on the morning of August 9, 2023, while traveling south on Highway 30.*

130.    Initial estimates from the Pacific Disaster Center and the Federal Emergency

Management Agency ("FEMA") estimate the cost to rebuild and restore damage from the

Lāhainā Fire at upwards of $5 billion.[33]

## CLASS ALLEGATIONS

131.    Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure

(FRCP) 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and, as warranted, 23(c)(4), on behalf of themselves

and a class defined as:

> All individuals and businesses that, as of August 8, 2023, worked
> in, did business in, or owned or resided on real property in West
> Maui ZIP Codes 96761, 96767 and suffered real property, personal
> property, business losses, and/or personal injury (excluding

---

[33] Maui County, Pacific Disaster Center and the Federal Emergency Management Agency releases Fire Damage (Aug. 12, 2023), https://www.mauicounty.gov/CivicAlerts.aspx?AID=12683.

wrongful death) from the Lāhainā Fire.

132.    Excluded from the Class are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the August 8, 2023 Lāhainā Fire, arise out of a right of subrogation, whether equitable, contractual, or otherwise.

133.    Plaintiffs hereby reserve the right to amend or modify the Class definition after having had an opportunity to conduct additional investigation and discovery.

134.    The proposed Class meets the criteria for certification under FRCP 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4).

*Numerosity and Ascertainability*

135.    This action satisfies the requirements of FRCP 23(a)(1). There are thousands of Class Members, rendering it so numerous that joinder of all members is impractical.

136.    While the exact number of Class Members is unknown to Plaintiffs at this time, it is ascertainable. The proposed Class includes thousands of residents and businesses whose property, livelihoods, and businesses were damaged or destroyed by the Lāhainā Fire. Parcel-specific Class Members can be determined using publicly available data and identified within a reasonable degree of data reliability and scientific certainty. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

*Common Issues of Law and Fact*

137.    This action satisfies the requirements of FRCP 23(a)(2) and 23(c)(4) because this action involves numerous questions of fact and law common to Plaintiffs and Class Members. Common questions include, but are not limited to, the following:

a.      Whether power and telecommunications infrastructure that the HECO and Telecommunications Defendants owned, operated, controlled, or managed caused the Lāhainā Fire;

b.      Whether the Lāhainā Fire, which Defendants caused, damaged or destroyed homes, businesses, personal property, buildings, and other property;

c.      Whether the HECO Defendants' decision to not de-energize power lines was negligent and/or negligent per se;

d.      Whether the HECO Defendants' decision to not de-energize power lines caused a private and/or public nuisance;

e.      Whether the HECO Defendants' decision to not de-energize power lines caused a trespass;

f.      Whether the HECO Defendants and Telecommunications Defendants are liable pursuant to the doctrine of inverse condemnation;

g.      Whether the HECO Defendants and Telecommunications Defendants were negligent in their construction, maintenance, and/or operation of their infrastructure;

h.      Whether the HECO Defendants and Telecommunications Defendants failed to reasonably inspect their infrastructure for hazardous conditions;

i.      Whether the HECO Defendants and Telecommunications Defendants failed to reasonably clear vegetation around infrastructure to mitigate the risk of fire;

j.      Whether the HECO Defendants and Telecommunications Defendants failed to reasonably implement policies and procedures, and use equipment, to avoid igniting or spreading fire;

k.      Whether the HECO Defendants failed to reasonably adjust their operations despite warnings about weather conditions that could cause rapid and dangerous fire growth and spread;

l.      Whether Plaintiffs and the Class are entitled to injunctive relief and/or other equitable relief, and, if so, the methodology for determining such relief;

m.      Whether Bishop Estate and the West Maui Landowner Defendants failed to perform adequate vegetation management on their land in and/or adjacent to Lāhainā;

n.      Whether Bishop Estate and the West Maui Landowner Defendants' failure to implement adequate wildfire mitigation practices, such as maintenance of fire breaks and removal of grasses in excess of 18 inches above the ground, was a substantial cause and/or spread of the Lāhainā Fire;

o.    Whether Bishop Estate and the West Maui Landowner Defendants' failure to perform adequate vegetation management was a substantial cause of the Lāhainā Fire; and

p.    Whether Defendant Maui County negligently failed to warn its residents of the Lāhainā Fire.

q.    Whether Defendant Maui County negligently failed to exercise its authority to mitigate the risk of harm caused by the Lāhainā Fire.

*Typicality*

138.    This action satisfies the requirements of FRCP 23(a)(3) because Plaintiffs' claims are typical of Class Members' claims and arise from Defendants' same course of conduct. Plaintiffs' claims are based upon the same legal theories as Class Members' claims. Plaintiffs and Class Members sustained damages as a direct and proximate result of Defendants' same wrongful acts and omissions.

*Adequacy*

139.    This action satisfies the requirements of FRCP 23(a)(4) because Plaintiffs will fairly and adequately represent and protect Class Members' interests. Plaintiffs have retained counsel with substantial experience in prosecuting complex class action and wildfire tort litigation.

140.    Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect Class Members' interests.

*Superiority and Predominance*

141.    This action satisfies the requirements of FRCP 23(b)(3) because a class action is the superior method for the fair and efficient adjudication of this controversy. Common questions of law and fact predominate over any individual questions.

142.    The prosecution of this case as a class action presents fewer management difficulties, better conserves judicial resources and the parties' resources, and more effectively

protects the rights of each Class Member than would piecemeal litigation. Any challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public, making class adjudication superior to other alternatives.

143.    This Court is experienced in managing class action litigation and this is an appropriate forum because Defendants conduct significant business in this County and in the State of Hawaiʻi, including many of the acts and omissions at issue in this case.

144.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. FRCP 23 provides the Court with authority, discretion, and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

145.    The Court may, on motion or on its own determination, certify multiple subclasses for claims sharing common legal questions, and/or utilize the provisions of FRCP 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication.

*23(b)(1) Limited Fund Class Action*

146.    In the event a court determines by or Defendants assert that the fire claims against the HECO Defendants are likely to exceed their available assets and insurance, this action may also be maintained as a class action under FRCP 23(b)(1)(B). The paradigm case for 23(b)(1)(B) certification is one where there is a limited fund of money available to satisfy class members' claims, such that if adjudicated individually, the fund will likely be exhausted before all the claimants have been compensated. 2 Newberg on Class Actions § 4:16 (5th ed.). In such cases, early claimants' lawsuits may be dispositive of other claimants' interests and/or will substantially

impede later claimants' ability to protect those interests. A limited fund class action, on the other hand, helps ensure that finite resources are distributed equitably among claimants, based on the relative merits and value of their claims, rather than fortuitously on their place in line.

147.     There is a substantial risk that the funds available here will be insufficient to fully compensate all class members. Initial numbers from the Pacific Disaster Center and FEMA estimate that the cost of rebuilding following damage from the Lāhainā Fire is $5.52 billion.



*An infographic released jointly by the Maui Emergency Management Agency, Pacific Disaster Center and FEMA on August 12, 2023.*

148.     The HECO Defendants' available assets and insurance may only constitute a fraction of those costs. HECO, MECO, and HELCO's parent corporation, HEI, had a market cap

valuation of $3.55 billion before the Lāhainā Fire. As of September 1, 2023, HEI's market cap valuation had sharply declined to around $1.65 billion. As of May 31, 2024, HEI's market cap valuation has continued to slide to $1.17 billion.

149.    In light of the potentially limited funds available to compensate class members, the need for court supervision to ensure a fair and equitable distribution of available funds is paramount. A limited fund class action protects all stakeholders by serving as a more equitable and efficient means of distributing available assets than the likely alternative of bankruptcy. In a bankruptcy scenario, secured creditors often receive priority, leaving unsecured creditors, including fire victims, with meager or even no recoveries. In contrast, limited fund class actions provide for court oversight to ensure all similarly situated claimants share in the available funds, based on their respective claims.

150.    Limited fund class actions also provide a more streamlined and efficient resolution than bankruptcy, ensuring that a more substantial portion of the fund is distributed to claimants rather than absorbed by administrative costs. This efficiency also conserves the parties' and the court's resources and reduces delays in getting relief to a community desperately in need of resources to rebuild.

*23(b)(2) Equitable Relief*

151.    Additionally, the HECO Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class, such that court imposition of uniform relief is necessary to ensure compatible standards of conduct toward the Class. Equitable relief to the Class as a whole is therefore appropriate under Rule 23(b)(2).

## FIRST CLAIM FOR RELIEF
### (Negligence – All Defendants)

152.   Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

153.   The HECO Defendants and Telecommunications Defendants have a non-transferable, non-delegable duty to apply a level of care commensurate with and proportionate to the danger of designing, engineering, constructing, operating, and maintaining electrical transmission and distribution systems, including pole loading and vegetation clearance.

154.   The HECO Defendants have a non-transferable, non-delegable duty of vigilant oversight in the maintenance, use, operation, repair, and inspection appropriate to the changing conditions and circumstances of their electrical transmission and distribution systems.

155.   The HECO Defendants and Telecommunications Defendants have special knowledge and expertise far above that of a layperson that they were required to apply to the design, engineering, construction, use, operation, inspection, repair, and maintenance of electrical lines, infrastructure, equipment, and vegetation in order to assure safety under all the local conditions in their service area, including, but not limited to, those conditions identified herein.

156.   All Defendants have a non-transferable, non-delegable duty to perform proactive and corrective vegetation management around power infrastructure.

157.   The HECO Defendants and Telecommunications Defendants negligently breached those duties by, among other things:

    a.   Failing to design and build power lines, and other infrastructure in a manner that would prevent them from causing fire, electrical arcs, or sparks in high-wind events.

b.    Failing to properly maintain their power poles and lines, rights of way, and other electrical infrastructure, including by failing to reasonably clear vegetation around power line infrastructure to mitigate the risk of fire.

c.    Failing to reasonably inspect their power line infrastructure for hazardous conditions.

d.    Failing to reasonably implement policies and procedures, and use equipment, to avoid igniting or spreading fire.

e.    Failing to reasonably adjust their operations on and after August 8, 2023 despite warnings about weather conditions that could cause fires to ignite and grow rapidly and dangerously.

158.    In addition, the HECO Defendants negligently breached their duties by failing to reasonably de-energize power lines during critical and extremely critical fire conditions, when they knew or in the exercise of reasonable care should have known, that the then-present fire conditions would cause energized power lines to slap, fall, or otherwise contact vegetation, structures, and objects.

159.    At all times mentioned herein, the HECO Defendants and Telecommunications Defendants failed to properly inspect and maintain electrical infrastructure and equipment, which they knew, given the then-existing and known weather, climate, and fire-risk conditions, posed a risk of harm to Plaintiffs and the Class, and to their real and/or personal property.

160.    Defendants were aware that if the subject electrical infrastructure came into contact with vegetation, a fire would likely result. Defendants also knew that, given the existing and known weather, climate, and fire-risk conditions, this fire was likely to pose a risk of harm to Plaintiffs and Class Members.

161.    The HECO and Telecommunications Defendants were and are in a special relationship with Plaintiffs and the Class. As a supplier of electrical power to Class Members (and/or entities in privity with the Class) and the region in which Plaintiffs and the Class live and

do business, the HECO Defendants' operation of its electrical equipment was intended to, and did, directly affect the Class.

162.     Bishop Estate and the West Maui Landowner Defendants owed Plaintiffs and the Class duties to perform adequate vegetation management on their land to mitigate the risk of fire, including the duty to construct fire breaks to help control and prevent the spread of wildfires.

163.     Bishop Estate and the West Maui Landowner Defendants breached these duties by, among other things, failing to maintain vegetation properly on their land, allowing the land to become and remain overgrown with highly flammable grasses, and failing to implement necessary fire mitigation measures, including failing to install proper fire breaks.

164.     Defendant Maui County had a duty to warn all of its residents of the danger posed by the strong winds and potential fire, and to warn all residents of approaching wildfires.

165.     Defendant Maui County breached its duties by failing to take all reasonable steps to properly warn residents of approaching wildfires, including by failing to timely activate the County's emergency warning systems to notify residents of the approaching fire.

166.     Defendant Maui County had a duty to use its authority to suppress or mitigate invasive vegetation to prevent the risk of harm from wildfires.

167.     Defendant Maui County breached its duty by failing to exercise its authority, including by failing to use its regulatory authority to enforce vegetation management regulations, its failure to manage lands under its ownership and control, and its failure to adopt the strategic recommendations it received from advising agencies.

168.     Each Defendant's negligence was a substantial factor in causing injuries to Plaintiffs and the Class.

169.     As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members suffered damages including, but not limited to property damage, loss of cherished possessions, economic loss, business loss, personal injury (except wrongful death), emotional distress, annoyance, disturbance, inconvenience, loss of quiet enjoyment of their property, and costs related to evacuation and/or relocation.

170.     Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Members' rights, so as to warrant the imposition of punitive damages.

**SECOND CLAIM FOR RELIEF**
**(Negligence Per Se – HECO Defendants,**
**Telecommunications Defendants and Bishop Estate)**

171.     Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

172.     The HECO Defendants and Telecommunications Defendants were negligent as a matter of law by failing to comply with their responsibilities under Hawai'i PUC General Order No. 7 and the 2002 version of the NESC as adopted by HAR § 6-73-11.

173.     PUC General Order No. 7 § 8.2.a dictates that "[e]ach utility shall exercise reasonable care to reduce the hazards to which its employees, its customers, and the general public may be subjected." The HECO Defendants and Telecommunications Defendants failed to exercise reasonable care to reduce hazards to its customers and the general public in at least the following ways:

a.     Failing to design and build power and telecommunications poles, lines, and other infrastructure in a manner that would prevent them from causing fire, electrical arcs, or sparks in high-wind events.

b.     Failing to maintain their power and telecommunications poles, lines, rights of way, and other electrical infrastructure, including by failing to prevent

overloading of the power poles and failing to reasonably clear vegetation around power line infrastructure to mitigate the risk of fire.

c.     Failing to reasonably inspect their power and telecommunications line infrastructure for hazardous conditions.

d.     Failing to reasonably implement policies and procedures, and use equipment, to avoid igniting or spreading fire.

e.     Failing to reasonably adjust their operations on and after August 8, 2023, despite past fires and warnings about weather conditions that could cause fires to ignite and grow rapidly and dangerously.

174.    In addition, the HECO Defendants failed to exercise reasonable care to reduce hazards to its customers and the general public by failing to reasonably de-energize power lines during critical and extremely critical fire conditions when they knew or in the exercise of reasonable care should have known that the then-present fire conditions would cause energized lines to fall or otherwise contact vegetation, structures, and objects.

175.    NESC § 214(A) mandates that electric supply lines and equipment be inspected, maintained, and tested as necessary to remedy all defects that "could reasonably be expected to endanger life or property."

176.    NESC § 217(A) mandates that all electric supply line supporting structures shall be "maintained so as to be exposed as little as practical to brush" and other vegetation and fire hazards.

177.    NESC § 250-2(b) requires that wooden power poles in Hawaii be built to withstand wind speeds of 105 miles per hour.

178.    The HECO Defendants and Telecommunications Defendants violated NESC §§ 214(A) and 250-2(b) by failing to properly construct, inspect, repair, maintain, manage, test, and/or operate their power line and communications infrastructure.

179.    The HECO Defendants and Telecommunications Defendants violated NESC §§ 214(A) and 217(A) by failing to keep vegetation and trees properly cleared at a safe distance to prevent contact with power line infrastructure.

180.    Plaintiffs and the Class are within the class of persons intended to be protected by PUC General Order No. 7 and NESC §§ 214(A), 217(A), and 250-2(b).

181.    As a direct and proximate result of the HECO Defendants' violations of PUC General Order No. 7 and NESC §§ 214(A) and 217(A), Plaintiffs and the Class have suffered, and will continue to suffer, harm, injury, and losses as set forth above.

182.    Maui County Code § 10.13.10.2.1 requires maintenance of an effective firebreak by removing and clearing away flammable vegetation and combustible growth from designated areas and from within 30 feet of buildings or structures.

183.    Bishop Estate violated Maui County Code § 10.13.10.2.1 by failing to remove and clear flammable vegetation from land it owned, managed, or otherwise controlled.

184.    Plaintiffs and the Class are within the class of persons intended to be protected by Maui County Code § 10.13.10.2.1.

185.    As a direct and proximate result of the Bishop Estate's violation of Maui County Code § 10.13.10.2.1, Plaintiffs and the Class have suffered and will continue to suffer harm, injury, and losses as set forth above.

186.    As a result of the foregoing, Plaintiffs and the Class suffered damages in an amount to be proven at trial.

187.    The conduct of the HECO Defendants, the Telecommunications Defendants, and Bishop Estate as alleged herein shows that these Defendants acted with gross neglect, willfully

and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Members' rights so as to warrant the imposition of punitive damages.

## THIRD CLAIM FOR RELIEF
### (Gross Negligence - HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants)

188.    Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

189.    The HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants knew of the extreme fire danger that high-wind and Red Flag conditions posed.

190.    Despite these Defendants' knowledge of the risk of extreme fire danger, Defendants failed to implement proper wildfire risk mitigation measures as outlined above, including by failing to implement proper vegetation management policies.

191.    Despite the HECO Defendants' knowledge of the risk of extreme fire danger in high-wind and Red Flag conditions, the HECO Defendants chose not to de-energize their power lines during the extreme weather conditions.

192.    The HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants acted with indifference to the probable consequences of their acts and omissions because the circumstances proclaimed danger and warned these Defendants of the impending disaster. These Defendants did nothing.

193.    As a direct and proximate result of the gross negligence  of the HECO Defendants, the Telecommunications Defendants, Bishop Estate, and the West Maui Landowner Defendants, Plaintiffs and the Class have suffered and will suffer harm, injury, and losses as set forth above.

194.     As a result of the foregoing, Plaintiffs and the Class suffered damages in an amount to be proven at trial.

195.     The conduct of the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants as alleged herein shows that the Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Members' rights, so as to warrant the imposition of punitive damages.

**FOURTH CLAIM FOR RELIEF**
**(Private Nuisance – HECO Defendants, Telecommunications Defendants,**
**Bishop Estate, and West Maui Landowner Defendants)**

196.     Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

197.     Plaintiffs and the Class have possessory interests in the property the Lāhainā Fire damaged, destroyed, and/or harmed, and that possessory interest includes the right to quiet use and enjoyment.

198.     The wrongful acts and/or omissions of the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants, as set forth above, caused and contributed to the Lāhainā Fire that damaged and destroyed real and personal property belonging to Plaintiffs and Class Members.

199.     The negligence, recklessness, and/or abnormally dangerous actions and inactions of the HECO Defendants, the Telecommunications Defendants, Bishop Estate, and the West Maui Landowner Defendants created a nuisance that has unlawfully annoyed and disturbed Plaintiffs' and Class Members' free use, possession, and enjoyment of their real and/or personal property. Such annoyance and disturbance includes, but is not limited to the following:

a.     Total destruction of Plaintiffs' and Class Members' real and personal property.

b.     Damage to Plaintiffs' and Class Members' real and personal property.

c.      Plaintiffs' and Class Members' loss of use and ability to enjoy their real and personal property.

d.      Diminution in the value of Plaintiffs' and Class Members' real and personal property.

e.      Emotional distress.

f.      Annoyance and inconvenience.

200.    As a direct and proximate result of the wrongful acts and/or omissions of the HECO Defendants, the Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants, Plaintiffs and the Class have suffered and will suffer harm, injury, and losses as set forth above.

201.    As a result of the foregoing, Plaintiffs and the Class suffered damages in an amount to be proven at trial.

202.    The conduct of the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants, as alleged herein, shows that the Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Members' rights, so as to warrant the imposition of punitive damages.

**FIFTH CLAIM FOR RELIEF**
**(Public Nuisance - HECO Defendants, Telecommunications Defendants,**
**Bishop Estate, and West Maui Landowner Defendants)**

203.    Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

204.    The wrongful acts and/or omissions of the HECO Defendants, the Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants, as set forth above, caused and contributed to the Lāhainā Fire that damaged and destroyed real and personal property belonging to Plaintiffs and the Class.

205.     The wrongful acts and/or omissions of the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants, as set forth above, created an unreasonable risk of harm that a fire would ignite during critical and extremely critical fire conditions and then spread onto Plaintiffs' and the Class's real and personal property. Defendants' behavior was negligent, reckless, and/or abnormally dangerous.

206.     The negligence, recklessness, and/or abnormally dangerous actions and inactions of the HECO Defendants, the Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants created a nuisance that has unlawfully annoyed and disturbed Plaintiffs' and the Class's free use, possession, and enjoyment of their real and personal property. Such annoyance and disturbance includes, but is not limited to the following:

a.     Total destruction of Plaintiffs' and Class Members' real and personal property.

b.     Damage to Plaintiffs' and Class Members' real and personal property.

c.     Plaintiffs' and Class Members' loss of use and ability to enjoy their real and personal property.

d.     Diminution in the value of Plaintiffs' and Class Members' real and personal property.

e.     Annoyance and inconvenience.

207.     Plaintiffs and the Class suffered special injuries distinct from the general public when fires caused the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants cased damaged and/or destroyed Plaintiffs' and the Class's homes, businesses, and/or property.

208.     The HECO Defendants, the Telecommunications Defendants, Bishop Estate, and the West Maui Landowner Defendants substantially and unreasonably interfered with Plaintiffs' and the Class's use and enjoyment of their property. This interference constitutes a nuisance for

which Defendants are liable to Plaintiffs and the Class for all damages arising from such loss of use and enjoyment, including compensatory relief, in an amount to be proven at trial.

209.    Whatever social utility the operations of the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendant may provide is outweighed by the harm these Defendants' operations have imposed on Plaintiffs and the Class.

210.    As a result of the foregoing, Plaintiffs and the Class suffered damages in an amount to be proven at trial.

211.    The conduct of the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants, as alleged herein, shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Members' rights, so as to warrant the imposition of punitive damages.

### SIXTH CLAIM FOR RELIEF
**(Trespass - HECO Defendants, Telecommunications Defendants,
Bishop Estate, and West Maui Landowner Defendants)**

212.    Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

213.    At all times relevant herein, Plaintiffs and Class Members owned and/or had a possessory interest in real property the Lāhainā Fire damage.

214.    At all times relevant herein, Plaintiffs and Class Members were occupiers of real property damaged the Lāhainā Fire.

215.    At all times relevant herein, Plaintiffs and Class Members owned and/or had a possessory interest in personal property the Lāhainā Fire damaged.

216.    The HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants had a duty to use reasonable care not to enter, intrude on, or

invade Plaintiffs' and Class Members' real properties or to unlawfully interfere with Plaintiffs' and Class Members' possession of personal property.

217.    Through the wrongful actions and inactions set forth above, the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants negligently allowed the Lāhainā Fire to ignite and/or spread out of control, causing the fire to wrongfully occupy land belonging to Plaintiffs and Class Members.

218.    Through the wrongful actions and inactions set forth above, the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants negligently allowed the Lāhainā Fire to ignite and/or spread out of control, causing the fire to unlawfully interfere with Plaintiffs and Class Members' possession of personal property.

219.    Trespass is the spread of a negligently caused fire so that the fire wrongfully occupies the land of another.

220.    Trespass to chattel is the spread of a negligently caused fire, so that the fire unlawfully interferes with another's possession of personal property.

221.    Plaintiffs and Class Members did not grant permission to the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants to cause the Lāhainā Fire to enter their properties and/or damage or destroy their personal property.

222.    As a direct, proximate, and substantial cause of the trespasses, Plaintiffs and Class members have suffered, and will continue to suffer, injury and damages as set forth above, including, but not limited to, damage to real and/or personal property, in an amount to be proved at the time of trial.

223.    As a further direct and proximate result of the conduct of the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants, Plaintiffs seek the reasonable cost of repair or restoration of the property to its original condition and/or loss-of-use damages.

224.    The conduct of the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants was willful and wanton, and with a conscious contempt and disdain for the disastrous consequences that Defendants knew could occur as a result of their dangerous conduct. Accordingly, the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants acted with malice towards Plaintiffs and Class Members, which is an appropriate predicate fact for an award of exemplary/punitive damages in a sum according to proof.

## SEVENTH CLAIM FOR RELIEF
### (Negligent Interference with Prospective Economic Advantage - HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants)

225.    Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

226.    Plaintiffs and the Class have existing or prospective economic relationships with citizens of the region impacted by the Lāhainā Fire, visitors to the region, and other individuals and organizations in and related to the region.

227.    These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs and the Class.

228.    The HECO Defendants, the Telecommunications  Defendants, Bishop Estate, and West Maui Landowner Defendants knew or should have known of these existing and prospective economic relationships.

229.     The HECO Defendants, the Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants owed a duty to Plaintiffs and the Class to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiffs and the Class.

230.     The HECO Defendants, the Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants were negligent and failed to act with reasonable care as set forth above.

231.     For instance, the HECO Defendants and the Telecommunications Defendants breached their duty to Plaintiffs and the Class by, among other things, failing to install and/or maintain reasonable safety equipment to prevent fires, failing to properly maintain and/or operate their electrical infrastructure in a safe condition, and failing to manage the vegetation surrounding their equipment.

232.     The HECO Defendants, the Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants knew or should have known that, if they failed to act with reasonable care, the existing or prospective economic relationships of Plaintiffs and the Class would be interfered with and disrupted.

233.     The HECO Defendants, the Telecommunications  Defendants, Bishop Estate, and West Maui Landowner Defendants engaged in wrongful acts and/or omissions as set forth above.

234.     As a direct and proximate result of the wrongful acts and/or omissions of the HECO Defendants, the Telecommunications  Defendants, Bishop Estate, and West Maui Landowner Defendants, these Defendants negligently and recklessly interfered with and disrupted the existing and prospective economic relationships of Plaintiffs and the Class.

235.    As a direct and proximate result of the wrongful acts and/or omissions of the HECO Defendants, Telecommunications Defendants, Bishop Estate, and West Maui Landowner Defendants, Plaintiffs and the Class have suffered and will suffer harm, injury, and losses as set forth above.

236.    As a result of the foregoing, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**
**(Strict Liability - HECO Defendants)**

237.    Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

238.    The HECO Defendants engaged in an abnormally dangerous and/or ultrahazardous activity by operating high-powered electrical transmission lines and services without taking efforts to eliminate or mitigate the risk of fire, particularly in the presence of high winds and hurricane conditions and in light of the extreme drought conditions plaguing Maui.

239.    The HECO Defendants' wrongful acts and/or omissions, as set forth above, created a high degree of risk of harm to Plaintiffs and the Class, as well as their real and/or personal property and businesses.

240.    Whatever social utility the HECO Defendants' operation may provide is outweighed by the harm their operations have caused Plaintiffs and the Class.

241.    As a direct and proximate result of the HECO Defendants' wrongful acts and/or omissions, Plaintiffs and the Class have suffered and will suffer harm, injury, and losses, as set forth above.

242.    As a result of the foregoing, Plaintiffs and the Class suffered damages in an amount to be proven at trial.

243.    The HECO Defendants' conduct as alleged herein shows that the HECO Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Members' rights, so as to warrant the imposition of punitive damages.

244.    As a proximate and legal result of the HECO Defendants' conduct, Plaintiffs have been compelled to resort to litigation and therefore request an award of all consequential damages, including, but not limited to, attorneys' fees and costs incurred in such litigation, in amounts to be proven at time of trial.

## NINTH CLAIM FOR RELIEF
**(Inverse Condemnation - HECO Defendants and Telecommunications Defendants)**

245.    Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

246.    Plaintiffs and the Class own and/or claim an interest in their property.

247.    The Hawaiʻi Constitution, Article I, Section 20 provides that, "Private property shall not be taken or damaged for public use without just compensation."

248.    Pursuant to HRS § 269-1, the HECO Defendants and Telecommunications Defendants are a public utility because they own, control, operate, or manage equipment or part of equipment used for the conveyance or transmission of telecommunications messages; transmission of intelligence by electricity; and the conveyance or transmission of light, power, and heat.

249.    None of the Telecommunications Defendants solely provide cable service as defined by HRS § 269-1 because each provides some form of two-way transmission via internet or phone service.

250.     The HECO Defendants and Telecommunications Defendants designed, installed, owned, operated, used, controlled, managed, and/or maintained overhead electrical infrastructure in Hawaiʻi for the purpose of providing electricity to the public, for public use. Thus, the HECO Defendants and Telecommunications Defendants each operate as a public utility.

251.     HRS § 101-4 gives the HECO Defendants and Telecommunications Defendants "[t]he right and power of eminent domain" as operators of a public utility. Thus, the HECO Defendants and Telecommunications Defendants each have the power of condemnation.

252.     The HECO Defendants and Telecommunications Defendants intentionally undertook the actions and inaction described above, including in the following ways:

a.     Failing to design and build power poles and lines, and other infrastructure in a manner that would prevent them from causing fire, electrical arcs, or sparks in high-wind events.

b.     Failing to maintain their power poles and lines, rights of way, and other electrical infrastructure, including by failing to reasonably clear vegetation around power line infrastructure, to mitigate the risk of fire.

c.     Failing to reasonably inspect their power line infrastructure for hazardous conditions.

d.     Failing to exercise reasonable care to not overload power poles with inadequately supported telecommunications equipment.

e.     Failing to reasonably de-energize power lines during critical and extremely critical fire conditions when they knew, or in the exercise of reasonable care should have known, that the then-present fire conditions would cause energized lines to fall or otherwise contact vegetation, structures, and objects.

f.     Failing to reasonably de-energize power lines during the then-present critical and extremely critical fire conditions even after they had knowledge that some power lines had fallen or had otherwise come into contact with vegetation, structures, and objects.

g.     Failing to reasonably implement policies and procedures, and use equipment, to avoid igniting or spreading fire.

h.     Failing to reasonably adjust their operations on and after August 8, 2023, despite warnings about weather conditions that could cause fires to ignite and grow rapidly and dangerously.

253.    In addition, The HECO Defendants intentionally undertook the actions and inaction described above, by failing to reasonably de-energize power lines, even after fires had been ignited by their power line infrastructure.

254.    The HECO Defendants' and Telecommunications Defendants' negligent and reckless operation of its power and telecommunications infrastructure necessarily caused the Lāhainā Fire, which physically invaded Plaintiffs' and Class Members' properties and destroyed real and personal property belonging to Plaintiffs and the Class. Defendants also interfered, and substantially interfered, with the use, access, enjoyment, value, and marketability of Plaintiffs' and the Class Members' property.

255.    The HECO Defendants and Telecommunications Defendants have, therefore, taken private property from Plaintiffs and the Class without adequate or just compensation.

256.    Damages to Plaintiffs and the Class were the necessary, certain, predictable, and/or inevitable result of the HECO Defendants' and Telecommunications Defendants' actions and inactions.

257.    Whatever social utility the HECO Defendants' and Telecommunications Defendants' operation may provide is outweighed by the harm the HECO Defendants' and Telecommunications Defendants' operations have imposed on Plaintiffs.

258.    Justice, fairness, and the Hawai'i Constitution require that the HECO Defendants and the Telecommunications Defendants compensate Plaintiffs and the Class for the taking of their property and their injuries.

259.    As a direct and proximate result of the HECO Defendants' and Telecommunications Defendants' wrongful acts and/or omissions, Plaintiffs and the Class have suffered and will suffer harm, injury, and losses as set forth above.

260.    As a result of the foregoing, Plaintiffs and the Class suffered damages in an amount to be proven at trial.

261.    The HECO Defendants' and Telecommunications Defendants' conduct as alleged herein shows that the HECO Defendants and Telecommunications Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Members' rights, so as to warrant the imposition of punitive damages.

## TENTH CLAIM FOR RELIEF
### (Injunctive Relief - HECO Defendants and Telecommunications Defendants)

262.    Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

263.    Plaintiffs and the Class seek an order requiring the HECO Defendants and the Telecommunications Defendants to use tools and technologies to mitigate the risk of fire, including, but not limited to, implementing a public safety power shutoff program, burying transmission lines, using covered conductors and non-expulsion fuses, and disabling automatic reclosers during fire season.

264.    Plaintiffs and the Class seek an order requiring Defendants to comply with their obligations and duties pursuant to PUC General Order No. 7 and HAR 6-73-11.

265.    Plaintiffs and the Class seek an order requiring an accounting with respect to the amount of damages for Plaintiffs' first, second, third, fourth, fifth, sixth, seventh, eighth, and ninth claims for relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment against Defendants and the following relief:

A.     An order certifying the matter as a class action pursuant to FRCP 23, naming Plaintiffs as class representatives and naming Plaintiffs' counsel as class counsel;

B.     Damages according to proof;

C.     Diminution in value to Plaintiffs' real property;

D.     Punitive damages for Defendants' wanton, reckless, and grossly negligent conduct;

E.     Reasonable attorney's fees and costs, as appropriate;

F.     Any prejudgment interest provided by statute;

G.     Injunctive relief;

H.     Available equitable relief including unjust enrichment or other available equitable remedies;

I.     For such other and further relief as the Court may deem just and proper.

DATED:  June 4, 2024

*/s/ Lexi J. Hazam*

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Lexi J. Hazam
lhazam@lchb.com
Patrick I. Andrews
pandrews@lchb.com
Nicholas W. Lee
nlee@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000

Kelly K. McNabb
kmcnabb@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212-355-9500

REVERE & ASSOCIATES, LLLC
Terrance M. Revere
terry@revereandassociates.com
Paul V.K. Smith
paul@revereandassociates.com
970 N. Kalaheo, Suite A301
Kailua, Hawai'i 96734
Telephone: (808) 791-9550

LAW OFFICES OF RICHARD E.
WILSON, LLC
Richard E. Wilson
rewilsonlaw@yahoo.com
735 Bishop St., Suite 306
Honolulu, Hawai'i 96813
Telephone: (808) 545-1311

LAW OFFICE OF KYLE SMITH
Patrick Kyle Smith
kyle@mithlawhawaii.com
604 Ilimano Street
Kailua, Hawai'i 96734
Telephone: (808) 799-5175

*Attorneys for Plaintiffs*
*NOVA BURNES, et al., individually and on behalf of all*
*others similarly situated*

/s/ Kenneth S. Kasdan

KASDAN TURNER THOMSON BOOTH LLLC
Kenneth S. Kasdan
kskasdan@kasdancdlaw.com
Christopher K. Hikida
chikida@kasdancdlawhawaii.com
1003 Bishop Street, Suite 1180
Honolulu, Hawai'i 96813
Tel: (808) 369-8393
Fax: (808) 369-8392

*Attorneys for Plaintiffs*
*CHARDELL NAKI, et al., on behalf of herself and all others similarly situated*

*/s/ Graham B. LippSmith*

LIPPSMITH LLP
Graham B. LippSmith
g@lippsmith.com
MaryBeth LippSmith
mb@lippsmith.com
Jaclyn L. Anderson
jla@lippsmith.com
Celene Chan Andrews
cca@lippsmith.com
55 Merchant Street, Suite 1850
Honolulu, Hawaiʻi 96813
Tel: (213) 344-1820
Fax: (213) 513-2495

FOLEY BEZEK BEHLE & CURTIS, LLP
Robert A. Curtis
rcurtis@foleybezek.com
15 West Carrillo Street
Santa Barbara, California 93101
Tel: (805) 962-9495
Fax: (805) 962-0722

ROBERTSON & ASSOCIATES, LLP
Alexander Robertson, IV
arobertson@arobertsonlaw.com
32121 Lindero Canyon Road, Suite 200
Westlake Village, California 91361
Tel: (818) 851-3850
Fax: (818) 851-3851

*Attorneys for Plaintiffs*
*MONICA EDER, et al. and the putative class and*
*subclasses*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF HAWAI'I**

| | |
|---|---|
| *In Re: Lahaina Wildfire Litigation* | 1:23-cv-00435-JAO-BMK |
| | (Class Action) |
| | **CONSOLIDATED COMPLAINT** |

**DEMAND FOR JURY TRIAL**

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand trial by jury on all issues so triable herein.

DATED:  June 4, 2024        /s/ Lexi J. Hazam
                            LIEFF CABRASER HEIMANN &
                            BERNSTEIN, LLP
                            Lexi J. Hazam
                            lhazam@lchb.com
                            Patrick I. Andrews
                            pandrews@lchb.com
                            Nicholas W. Lee
                            nlee@lchb.com
                            275 Battery Street, 29th Floor
                            San Francisco, CA 94111-3339
                            Telephone: 415-956-1000

                            Kelly K. McNabb
                            kmcnabb@lchb.com
                            250 Hudson Street, 8th Floor
                            New York, NY 10013
                            Telephone: 212-355-9500

                            REVERE & ASSOCIATES, LLLC
                            Terrance M. Revere
                            terry@revereandassociates.com
                            Paul V.K. Smith
                            paul@revereandassociates.com
                            970 N. Kalaheo, Suite A301
                            Kailua, Hawaiʻi 96734
                            Telephone: (808) 791-9550

                            LAW OFFICES OF RICHARD E.
                            WILSON, LLC
                            Richard E. Wilson
                            rewilsonlaw@yahoo.com
                            735 Bishop St., Suite 306
                            Honolulu, Hawaiʻi 96813
                            Telephone: (808) 545-1311

                            LAW OFFICE OF KYLE SMITH
                            Patrick Kyle Smith
                            kyle@mithlawhawaii.com
                            604 Ilimano Street
                            Kailua, Hawaiʻi 96734
                            Telephone: (808) 799-5175

                            *Attorneys for Plaintiffs*
                            *NOVA BURNES, et al., individually and on behalf of all*
                            *others similarly situated*

*/s/ Kenneth S. Kasdan*
KASDAN TURNER THOMSON BOOTH LLLC
Kenneth S. Kasdan
kskasdan@kasdancdlaw.com
Christopher K. Hikida
chikida@kasdancdlawhawaii.com
1003 Bishop Street, Suite 1180
Honolulu, Hawaiʻi 96813
Tel: (808) 369-8393
Fax: (808) 369-8392

*Attorneys for Plaintiffs*
*CHARDELL NAKI, et al., on behalf of herself and all*
*others similarly situated*

*/s/ Graham B. LippSmith*

LIPPSMITH LLP
Graham B. LippSmith
g@lippsmith.com
MaryBeth LippSmith
mb@lippsmith.com
Jaclyn L. Anderson
jla@lippsmith.com
Celene Chan Andrews
cca@lippsmith.com
55 Merchant Street, Suite 1850
Honolulu, Hawaiʻi 96813
Tel: (213) 344-1820
Fax: (213) 513-2495

FOLEY BEZEK BEHLE & CURTIS, LLP
Robert A. Curtis
rcurtis@foleybezek.com
15 West Carrillo Street
Santa Barbara, California 93101
Tel: (805) 962-9495
Fax: (805) 962-0722

ROBERTSON & ASSOCIATES, LLP
Alexander Robertson, IV
arobertson@arobertsonlaw.com
32121 Lindero Canyon Road, Suite 200
Westlake Village, California 91361
Tel: (818) 851-3850
Fax: (818) 851-3851

*Attorneys for Plaintiffs*
*MONICA EDER, et al. and the putative class and*
*subclasses*